## *SANBORN *v*. BATCHELDER.

A married woman holding real estate in her own right prior to the law of 1860, but which she did not hold under the law of 1846 to her sole and separate use, could convey the same only by having her husband join with her in the same deed or conveyance of the land; but after the law ·of 1845 she could dispose of such real estate by will, subject only to the husband's rights as tenant by the courtesy.

But choses in action, or personal property held by a married woman in the same way, might be conveyed by her if the husband joined with her in the conveyance or consented to the sale; and she might dispose of such choses in action or personal property when held as aforesaid by will, if it appeared that her husband consented thereto, but not otherwise.

A party who would rescind a contract, on the ground of fraud or misrepresentation, must restore or offer to restore in some form whatever of advantage or benefit he has received from or under the contract. He cannot rescind the contract and at the same time continue to enjoy its benefits.

IN EQUITY. The bill alleges that in 1858 the plaintiff, Josiah Sanborn, was married to Sally Sanborn, with whom he lived until March, 1867, when she died, leaving about eight thousand dollars in personal property, which was at the time of her death and always before her death had been subject to the right of the plaintiff to take and reduce the same to his possession and control, as his own property, a large portion of which, to wit, the sum of five thousand dollars, accrued before the 29th of September, 1865, said property consisting mostly of notes, deposits in banks, and bank stock; that the defendant claims to hold all of said property as his own, under and by virtue of an alleged deed dated the 29th of September, 1865, purporting to be signed by the plaintiff and said Sally, and conveying to the defendant a certain tract of land in Chichester (Merrimack county), also conveying to the defendant all their personal property, a copy of which deed is annexed.

That on said 29th day of September, 1865, at the urgent request and solicitation of the defendant, the plaintiff and said Sally agreed to sell to the defendant the real estate mentioned in said deed and no more, and that the plaintiff, being unacquainted with such business and having no friend or counsel present, consented that the defendant should procure a deed of said property to be written, and that the defendant did, on the same day, procure a deed to be written by one Hosea Knowlton, to whom, in the absence of the plaintiff, the defendant gave directions as to how the deed should be; that afterwards,

---

*Decided June term, 1870.                              REPORTER.

on the same day, the plaintiff and his said wife did execute a deed to the defendant, which the defendant informed him was a deed of said real estate only; that at the time of the execution of said deed the plaintiff was unable to read writing or to write his name, and had no knowledge that he was conveying any personal property whatever, and did not know that said deed conveyed any personal property, and that he had no knowledge of the contents of the defendant's said deed until after the decease of his said wife, and that if he ever gave his consent to the execution and delivery of said deed, that consent was given and obtained by the false and fraudulent representations of the defendant.

Wherefore he prays that the defendant may be restrained by injunction against ever setting up said deed against the plaintiff's claim to the personal estate of said Sally Sanborn, which she had during her lifetime and at the time of her decease, and may be ordered to cancel said deed, and for such further orders and decrees as may be just.

The defendant answers and says that he admits the plaintiff's marriage to said Sally in 1858, and that he lived with her till the 12th day of April, 1867, when she died, but denies that at the time of her death she had personal estate exceeding one hundred dollars in value.

That on the 29th day of September, 1865, said plaintiff and said Sally his wife, for a valuable consideration, to wit, $150 in money, and the conveyance of a certain life estate in a certain farm in Deerfield (Rockingham county) to said plaintiff, and the reversion in the same farm to said Sally, in fee, duly executed and delivered to said Batchelder the deed referred to in said bill, by which they conveyed to the defendant the real estate described in said deed, together with all the personal estate of which they were at that time possessed; that the plaintiff and said Sally executed and delivered said deed to him of their own free will, without any urgent request or solicitation on his part; that said Sally gave directions as to how the deed should be written, and that said Knowlton, prior to the execution of said deed, informed the plaintiff and said Sally that the said deed was a conveyance by them to said Batchelder of the real estate described therein, together with all the personal property they then possessed, and that at the time of the execution of said deed the said Sally delivered to said defendant her notes and certificates of bank deposits; and that neither the plaintiff nor said Sally ever questioned the validity of said deed, or claimed that there was any misrepresentation or misunderstanding in regard to it, until after the decease of said Sally in April, 1867, and denies that, at the time of the execution and delivery of the deed, or at any time, he ever informed or stated to the plaintiff or said Sally that said deed was only a conveyance of the real estate, and also denies that there was any fraud practised upon the plaintiff or said Sally, or any false representations made to them or either of them to induce them to execute said deed.

*Wood*, for the plaintiff.

The grantors did not understand that they were conveying the per-

sonal estate. It is a sale without consideration, and is a most unaccountable sale. Some undue advantage was taken by the defendant of the grantors, and the sale ought to be set aside. 1 Story's Equity Jurisprudence, secs. 244–246; 1 Bro. Ch. Cases 1.

This case furnishes a proper case for equity. *Wheeler* v. *Smith,* 9 How. U. S. S. Ct.; 1 Story's Equity Jurisprudence, secs. 224, 235, 236, 238, and 251; Adams's Equity 183.

If the wife understood the deed, then it was intended as a fraud upon the plaintiff, and to accomplish it the defendant and she must have conspired together.

The clause in the deed conveys all personal property. We submit that the deed would convey only the property the grantors jointly owned, and would not convey the money or notes; and the defendant can claim only the farm. The plaintiff had the right to hold the estate of his wife, either by reducing it to possession before her death, or taking it as administrator after. *Hoyt* v. *White,* 46 N. H. 45; *Atherton* v. *McQuesten,* 46 N. H. 205; *Jones* v. *Brown,* 34 N. H. 439; *Judge of Probate* v. *Chamberlain,* 3 N. H. 129.

*Clark & Huse,* for the defendant.

Mrs. Sanborn owned the personal property in her own right. The plaintiff had not reduced the same to possession. She was competent to dispose of it, and had an undoubted right to convey the same as she did by the deed in question. Story's Equity Juris., secs. 1393, 1394; Gen. Stats., ch. 164, sec. 13.

The evidence proves conclusively that, at least so far as Mrs. Sanborn was concerned, the disposition of her personal property was in accordance with her desire, and that the deed was made to include her personal estate, by her express instructions, and with a full understanding on her part of what she was conveying. There is no evidence to justify the conclusion that she did not exercise a deliberate judgment, or that she was imposed upon, circumvented, or overcome by cunning or artifice or undue influence. It was a voluntary conveyance on her part; and want of consideration, which is the only evidence of fraud relied upon by the plaintiff, is neither evidence of fraud, nor ground for setting aside the deed. 37 N. H. 277; Story's Equity Juris., secs. 337, 244, 245, and 194.

If, as we hold, the real parties to the sale of the personal property were Mrs. Sanborn and this defendant, and that Mrs. Sanborn had a legal and equitable right to convey her personal property as she pleased, then her sanctioning this sale could not operate to defraud the plaintiff, as is claimed in his brief, nor will equity relieve against the provisions of a valid law. 7 N. H. 72.

It matters not whether the plaintiff had a right to hold the personal estate of his wife by reducing it to possession before her death or not. It is sufficient that he had waived his marital right in this respect, if any existed, up to the time of the conveyance, and that Mrs. Sanborn

conveyed the same in good faith, with a full understanding of what she was doing. 46 N. H. 132; 37 N. H. 145.

Even if the consent of the plaintiff was necessary to constitute a valid sale of the personal property, yet the testimony falls far short of establishing satisfactory proof that he was, at the time of the sale, ignorant of its contents, or that any fraudulent, cunning, or artifice was resorted to by this defendant to induce him to sign. The deed was written in his presence, according to instructions given by Mrs. Sanborn in his presence, and was read to him by the magistrate before signing. The conveyance, on his part, was purely voluntary and free from fraudulent inducements or representations; and even if it were true that it contained more than he knew of at the time, yet the defect or error which he claims in the deed resulted from his own fault and negligence, and he could be granted no relief in equity. 40 N. H. 271; 9 N. H. 392; 37 N. H. 277; Story's Equity Juris., secs. 105 and 152.

Mr. Sanborn, in his testimony, states that he had no knowledge that the deed contained a conveyance of the personal property until the day after the funeral of his wife, when he was informed by his daughter, Mrs. Anderson. In the same deposition he also testifies that his daughter was not there at the funeral, and did not come there until a week afterwards, and that he did not know where she was, showing that he could not have received any such information as he states from her, and that he was in fact aware of the clause in the deed conveying the personal estate of his wife, as he had been at that time in consultation with Mr. Woodman respecting it. The testimony shows that he was well aware of the conveyance of the personal property, and did not seek to avoid it until after the death of his wife.

*Wood*, in reply.

I. The property was obtained before 1860, except some interest accruing thereon since that time, and property held before that time vested in the husband. See *Atherton* v. *McQuesten*, 46 N. H. 205. By the statute of 1854, the law was not otherwise. The statute of 1860 does not change the law in that particular.

II. The marriage was before 1860, and the property vested in the husband. *Wendell* v. *Pierce*, 13 N. H. 506; *Burleigh* v. *Coffin*, 22 N. H. 119. The doctrine in relation to wills of married women is in accordance with our positions. Comp. Laws 381, sec. 11; *Cutter* v. *Butler*, 25 N. H. 343.

The will is offered in this case, not as a valid instrument—for we contend the wife had no right to make such will—but is offered to show how Mrs. Sanborn felt in relation to her estate, and that she would not have left such a will if she had understood that she had conveyed all the property to the defendant. The will shows how she understood the matter.

The doctrine of *George* v. *Cutting*, 46 N. H. 130, is directly with the plaintiff, unless the court can believe that Mrs. Sanborn understood

what she was doing, and that the plaintiff consented to the deed with a full understanding of the matter.

SARGENT, J. The facts in this case are very many of them undisputed. It appears that the plaintiff, Josiah Sanborn, was married in 1857 or 1858 to Sally Sanborn; that this was a second marriage of Sanborn, who had grown up children by a former wife. I infer that this was also the second marriage of Mrs. Sanborn, though she had no children, and has had none by Mr. Sanborn. At the marriage she was the owner of a farm in Chichester, with buildings and stock and farming tools and furniture, and also some bank stock and considerable money at interest, while he had a horse and harness and cart and a few other articles, and perhaps a little money to the amount of a hundred dollars or so, though that is not very well made out. She moved him home upon her farm, where they lived till August, 1865.

In June, 1859, she made her will, in which she gives to her two nephews, this defendant being one of them, all her real estate in fee; to her brother and four sisters, all her personal estate except her bank stock and money on hand and at interest; to her brother, her bank stock; to eleven nephews and nieces, the defendant being one of them, the sum of $200 each; and all the rest, residue, and remainder of her property and estate to her four sisters in fee. She gave nothing to her husband, and does not mention his name except in describing herself as his wife.

In August, 1865, their buildings were burnt, with much of their furniture and clothing. They then moved into the house of a Mrs. Sargent who lived near by, and remained there a while; and in September of the same year the trade was made referred to in the bill, by which Sanborn and wife conveyed to the defendant, Batchelder, their farm, which was then worth about $1000, for which the defendant conveyed to the plaintiff a life lease of a farm in Deerfield known as the Prescott farm, and conveyed the reversionary interest in said farm to the plaintiff's wife, Sally, this farm being worth $1500, with buildings on it; and in the course of that autumn the plaintiff and his wife moved on to this farm, where they continued to live till her death, which was April 12, 1867; and since that time the plaintiff has occupied the same premises and carried on the same farm, and continues so to do still.

All the personal property of the wife, Sally Sanborn, was kept by her in her own possession and under her own control while she lived, *except* for a while in the autumn of 1865, when the defendant claims to have had possession of most of it; but that fact is in controversy. But the husband, this plaintiff, never reduced it or any part of it to his possession during the life of his wife, she being as it would seem a pretty good financier, and he having no capacity for business except as a laborer and a teamster, and being unable to read or write. All the evidence on both sides tends to show that the husband never reduced this personal property of his wife to his possession. The bill itself does not

allege or claim that he did so, but only alleges that this property was
subject to his right to reduce the same to his possession.        There
was no ante-nuptial agreement in writing, and whether there was
any of any kind does not appear; but it seems entirely evident that it
was always understood by both that she held her own property entirely
within her own control, and that he had and was to have nothing to
do with it, at least while she lived; and it seems to me equally plain,
upon all the evidence, that Sally Sanborn desired and intended, if pos-
sible, to have her property go to her relatives, and not to her husband
or his heirs at her decease.

It does not appear whether her will has ever been proved, ap-
proved, and allowed in the court of probate, though there is some evi-
dence tending to show that it has been.

We understand the law as held in this State to be, that where a
married woman held real estate in her own right prior to the law of
1860, and which she did not hold under the law of 1846 to her sole
and separate use, she could only convey the same by having her hus-
band join with her in the same deed or conveyance of the land.   *Dow*
v. *Jewell*, 18 N. H. 355—S. C. 21 N. H. 470 ; *Matthews* v. *Puffer*, 19
N. H. 448 ; *Eaton* v. *George*, 40 N. H. 259, and cases cited ; *Leach* v.
*Noyes*, 45 N. H. 364, and cases.   Prior to 1845 she could not dispose of
her real estate by will, even with her husband's consent—*Marston* v. *Nor-
ton*, 5 N. H. 205 ; but after the law of 1845 she could dispose of her real
estate by will, subject to the husband's right as tenant by the courtesy,
though by the law of 1854 she could not devise her lands to her husband.
*Wakefield* v. *Phelps*, 37 N. H. 295, 306.

But where a married woman held choses in action or personal prop-
erty prior to the law of 1860 and not under the law of 1846, the hus-
band had the right to reduce them to his possession during his life if
he chose ; but if he did not do so, and she survived her husband, she
would hold this property as her own ; but if the husband survived the
wife, he took the property of the wife as his own absolute property, sub-
ject only to the payment of her debts, and was entitled to administer
upon her estate.   The wife might convey this property during her life
if the husband joined with her in the conveyance or consented to the
sale ; and she might dispose of her choses in action and personal prop-
erty, when held as aforesaid, by will, if it appeared that her husband
consented to the same, but not otherwise.   *Marston* v. *Carter*, 12 N. H.
159 ; *Coffin* v. *Morrill*, 22 N. H. 357 ; *Hall* v. *Young*, 37 N. H. 134 ;
*Jordan* v. *Cummings*, 43 N. H. 137 ; *Reed* v. *Blaisdell*, 16 N. H. 194 ;
*Wells* v. *Tyler*, 25 N. H. 340 ; *Cutter* v. *Butler*, 25 N. H. 343 ; *George*
v. *Cutting*, 46 N. H. 130 ; *Atherton* v. *McQuesten*, 46 N. H. 205 ; *Cas-
well* v. *Hill*, 47 N. H. 407.

Now if this will has been proved and allowed in the probate court,
and the decision of that court is conclusive, not only as to the capacity
of the maker to make the will and of its due execution, but also as to
the consent of the husband, as is intimated in *Cutter* v. *Butler*, *supra*,
then there would seem to be no question here for this plaintiff to settle,

but the only question would be between the executor named in said will and this defendant; and there being nothing here for the plaintiff, his bill would be dismissed.

But as it does not appear whether this will has been proved and allowed in the probate court or not, we will consider the other point in controversy here, which is as to a sale of this personal property. September 29, 1865, the plaintiff and his wife gave to the defendant a deed of their farm in Chichester, and this deed, after describing the farm, contains this clause: " also all our right, title, and interest in and to all of our personal estate, of whatever name or nature, or however situated, or wherever found; " .to have and to hold, &c.

Now the plaintiff alleges that though he signed this deed, which he does not deny, yet that he did not know at the time that this clause was in it, and never ascertained that fact till after his wife's decease. Now it appears on all hands that said Sally gave directions to the magistrate in regard to the provisions of this deed; it was written in her presence, at her house or the house where she lived, and in her room, she and the defendant being present in and out all the time, and the plaintiff a part of the time.    We are entirely satisfied that the deed was written just as she desired to have it written.    Whether she had become satisfied that there were doubts about her will being good to convey this property, or what her motive might have been, does not appear, nor does it appear whether the defendant made any arrangement with his relatives by which they were to have some share of this property which he had under the deed instead of what they were to have had by the will; but none of those relatives of the defendant and of the plaintiff's wife are here to object to the defendant's deed.

The defendant says that this deed was signed by the plaintiff with a full knowledge of its contents ; that he was consulted before the magistrate was called in, while he was at work in his field, by the defendant,—and this is admitted; and the defendant claims that he there bargained with the plaintiff to convey to the defendant his interest in the land, and also all right and claim he had or might have to his wife's personal property and all her estate.  The two parties, the plaintiff and the defendant, swear directly in each other's teeth about the deed being read and explained to plaintiff before he signed it, while the magistrate, who was called in to write the deed, fully sustains the defendant; and they both state a circumstance which, if true, is entirely decisive of the whole matter. They say that when the deed was explained to the plaintiff, and especially that part relating to the personal property, the plaintiff at first objected that the horse ought to be his, as he brought one there when he came there, but that his wife insisted that the horse should not be reserved to him, as the one which he brought there had died, and she had paid for the one they then had with her own money, and that this should go with the rest, and that the plaintiff finally consented ; and the deed was then agreed to, and another witness was called in, who simply witnessed the signatures and left, not knowing what the paper was, or anything of its contents.

This incident about the horse, though denied by the plaintiff, seems natural, as one that would be likely to happen, when we remember that the plaintiff, before his marriage to this woman, had been for many years a teamster, doing jobs with a horse team which constituted his principal possessions.

But let us examine the trade that was made. Some things about it are not in dispute. The plaintiff and his wife were old; they had been burnt out, and were living in a neighbor's house, and were both feeling very badly at the loss of their clothing and other things, as well as at the loss of their home. In this state of affairs, the wife desires to arrange with her nephew to take her property, and to get for them the Prescott place in Deerfield, with buildings all prepared. It is arranged without difficulty; the defendant is sent for, and goes there one morning, goes into the field where the plaintiff is at work, and makes the contract with him,—as the plaintiff says, to deed the farm only; as the defendant says, to convey all his right in his wife's estate, both real and personal: but the plaintiff was to receive, for whatever he agreed to convey, an estate for his life in the Prescott farm, and $150 in cash. This is admitted. After the bargain was made, the defendant went and procured a magistrate to come to the plaintiff's house; and he wrote the deed as he was directed by the defendant and the plaintiff's wife. While it was being written the plaintiff came in from the field, and remained till it was completed and executed. As between the defendant and the plaintiff's wife, it was rather a gift than a sale. The defendant was to convey to her the reversion of the Prescott farm, worth $1,500, and let her have her personal property to use as she needed during her life, and whatever she might need of the money for her own use; while she conveyed, by her husband joining with her in the deed to the defendant, the place in Chichester worth $1,000, and some $4,000 worth of personal property, bank stock, notes, &c.

It is not very material whether the defendant took possession of the notes and papers, &c., and retained them for a considerable time, as he claims he did, or not, for no creditors come in here to interfere; and the sale was well enough between the defendant and the plaintiff's wife, as far as her interest was concerned, because she might give away her interest in the property, as she evidently intended to do, for the most part; and if creditors do not interfere, and if her husband parted with his right understandingly, without fraud or misrepresentation, and for a valuable consideration, then there is no one to complain or object.

Taking the plaintiff's account of it, he conveyed an estate for the life of his wife only, in a farm without buildings, and worth only $1,000, and received in exchange an estate for his own life in a farm, with good buildings, and worth $1,500, and $150 in money besides, at a time and under circumstances when he would evidently have been glad to make some sacrifice to make such an exchange; and if, as he claims, he did not convey any interest in the personal property of his wife, and did not agree to do so, or understand that he was doing so, he certainly made a very profitable speculation in the exchange.

The plaintiff now claims that he received something for betterments made by him upon his wife's farm in Chichester; but these improvements were only the digging of stones, and the building of a small quantity of stone wall upon the farm, which could hardly be called betterments. But however that may be, it has been settled that the husband in such cases has no claim upon the wife or upon her estate for services rendered for her, or for improvements made upon her estate during coverture. *Burleigh* v. *Coffin*, 22 N. H. 118.

The plaintiff obtained an estate in a farm of one half more value than the one parted with, besides being just what he needed at the time. He also obtained a freehold estate for his own life instead of an estate only during the life of the wife, and, besides, the $150 in money, which would be just what he needed to replenish his scanty wardrobe; which sum he would not probably ever have obtained in any other way had he died before his wife died.

Then there is the evidence of Cate, who says that in the spring of 1866, the next year after the deed was given, the plaintiff told him he had signed the deed, and that it included the personal as well as real estate, and gave as a reason for thus parting with the personal property, that if his wife outlived him he should get nothing, but that by the trade he was getting something to help himself with when he most needed it. The plaintiff denies this, as he does all the other witnesses who testify to anything against him. The attempt on the part of the plaintiff's counsel to show that the plaintiff has failed rapidly since the fire, though it fails entirely to show him incompetent to trade and act for himself at the date of this deed, yet may account for this want of recollection. The evidence also tends to show that these proceedings would not have been commenced but for the officiousness of the plaintiff's neighbors, who, the moment his wife was dead, took a deep interest in his affairs, though none of them seemed disposed to stir the matter, or suggest to him that he had any rights in her property, while she lived.

If this plaintiff could avoid this deed on the ground of his not understanding its provisions, or on the ground that he was imposed upon or defrauded, yet he has evidently received a consideration for his release of his claim to this personal property, amounting at least to the sum of $150 cash, and the difference between an estate in the Chichester farm for his wife's life, and an estate in the Deerfield farm worth much more for his own life, which, as the result has proved, makes a very essential difference to this plaintiff.

Now it is a very well settled principle, at law as well as in equity, that the man who asks equity must do equity. He must restore or offer to restore what he has received as a consideration for the illegal or fraudulent agreement on his part. He cannot rescind the contract without offering to restore whatever advantage he has received under it. In case of fraud or imposition, the law would not be so particular about putting the defrauding party in as good a position or condition as he was in before, as is required in case one party rescinds a con-

tract for the failure of the other party to perform some material portion of the same contract; for in the case of fraud, the court will not lean in favor of the party who is shown to have practised the fraud, but will simply require that the party who has been defrauded, when he rescinds the contract on that ground, shall not be enjoying at the same time the benefits of such contract; that he shall not receive any actual benefit from the contract which he rescinds on the ground of fraud.

The plaintiff has not restored or offered to restore what he received under the contract, to wit, the $150 cash, nor the estate for his own life in the Prescott farm. Perhaps he could not properly be asked to restore what the estate in one farm was worth more than the other during the life of his wife, because the estate for the wife's life in any farm she might own, which did not come under the operation of the law of 1846 nor of 1860, would vest in the husband, as husband, at common law; yet without that exchange the plaintiff's right and interest in any farm of his wife's would have ceased at his wife's death. So that the use and occupation of this farm on which the plaintiff has lived ever since his wife's death, and still lives, is one of the benefits which he derived from the contract which he now seeks to rescind. But this he has not offered to restore.

But waiving that consideration, we find upon all the evidence that the plaintiff understood the contents of the deed fully when he signed it, and is, and of right ought to be, bound by it. Though here was no ante-nuptial contract in writing which would bind the parties, yet we are satisfied upon the evidence that there was an understanding between them that the wife was to keep her own property and dispose of it as she pleased, and that she would never have married the plaintiff upon any other terms or conditions. The conduct of both of them during all their married life tends to prove this; and if that was the understanding of the parties, it may explain why the plaintiff was willing to release all his claim to her property for a consideration which, in some aspects of the case, would seem too small, but which, if she had survived him, would have been just so much beyond what he ever expected, or would ever have obtained in any other way.

At the time this trade was made, in 1865, the plaintiff is shown to have been seventy years old; the wife's age does not distinctly appear, but so far as appears, the chances were at that time quite as favorable that the wife would survive as that the husband would.

When we consider the circumstances of the parties, and the contract that was made and embodied in the writings of Sept. 29, 1865, we are satisfied that the plaintiff received a consideration for releasing his claim to his wife's personal property, that he at the time so understood it, and from all these circumstances, in connection with the testimony of the magistrate who made the writings, and of Cate, all sustaining the positions taken by the defendant, we cannot avoid the conclusion that the plaintiff must be held bound by his deed, and that there must be judgment for defendant.                    *Bill dismissed.*